## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JOSEPH and JOSEPHINE A., by their
next friend, CORRINE WOLFE, et al.,

   Plaintiffs,

  vs.

          No.  CIV 80-623 JC/DJS

THE NEW MEXICO DEPARTMENT
OF HUMAN SERVICES, et al.,

   Defendants.[1]

## MEMORANDUM OPINION AND ORDER

   THIS MATTER is before the Court on remand from the Tenth Circuit Court of Appeals.

This matter also is before the Court for consideration of (1) the Court-requested Younger analysis

of the 1998 Stipulated Exit Plan by the parties; (2) Plaintiffs' Motion to Modify Stipulated Exit

Plan to Comport with the Tenth Circuit's January 7, 2002 Opinion[,] and to Affirm Remaining

Sections of the SEP, filed February 25, 2002 [Doc. No.1596]; and (3) Defendants' Motion to

Dismiss Provisions of Stipulated Exit Plan Not [sic] Enforceable Under Younger Pursuant to

Rufo and Rule 60(b)(5) and Memorandum in Support Thereof, filed March 25, 2002[2] [Doc. No.

1600]. The Court has read the briefs, and other documents submitted or filed by the parties, and

---

 [1] The caption used by the parties and by the courts for this case has varied, generally without
explanation.  But see, Defs.' Supp. Mem. at 1 n.1, filed Nov. 19, 1999 [Doc. No. 1561] (contending
Department cannot be a defendant and Department employees can be sued only in their individual
capacities); Defs.' Resp. at 1 n.1, filed Nov. 19, 1999 [Doc. No. 1558].  For purposes of this Opinion, the
Court has chosen to adopt the most current caption generally used by the parties, with the caveat that the
nomenclature may be inaccurate factually or legally or in noncompliance with Bluebook rules.

 [2] As a result of other activity in this case, Plaintiffs' response(s) was filed April 11, 2002 [Doc. No.
1605], and Defendants' reply May 3, 2002 [Doc. No. 1609].

the relevant authorities.  Excluding exited sections and part of Section II(D), the Court finds that the 1998 Stipulated Exit Plan is enforceable under <u>Younger</u>, as that doctrine is construed by the Tenth Circuit.  The Court further concludes that Plaintiffs' motion is well-taken and will be granted and that Defendants' motion is not well taken and will be denied.

## I.      BACKGROUND

Progress in resolving this 1980 civil rights class action has been a matter of two steps forward and one step back.  Plaintiffs are a class of abandoned, abused, or neglected children in the care and custody of the State of New Mexico.  Plaintiffs allege systemic failures on the part of New Mexico's Department of Human Services (HSD) and its successor, the New Mexico Children, Youth and Families Department (CYFD), and specified employees (collectively, the Department or Defendants), failures which effectively denied Plaintiffs meaningful access to adoption services and the chance to be raised in permanent, stable families.  Three years after the suit was filed and certified as a class action, the parties entered into a settlement in which Plaintiffs agreed to drop their request for damages in exchange for the Department's agreement to undertake systemic reforms.  The district court approved the settlement and entered a consent decree (Original Consent Decree) to govern the relationship among the parties and class members.

In 1994, the Department moved to have the action dismissed, arguing that it had substantially complied with the terms of the Original Consent Decree.  The district court granted the Department's motion, but was reversed on appeal by the Tenth Circuit.  On January 29, 1997, on remand, the special master recommended that the Department be held in contempt for violating the terms of the settlement.

In September 1998, the Original Consent Decree was vacated and replaced with a second

negotiated and court-approved consent decree, the Stipulated Exit Plan (SEP).[3]  The SEP contains specific benchmarks that allow the Department to remove itself from the district court's jurisdiction in piecemeal fashion as each benchmark is met.

On October 21, 1999, based on the findings of a jointly chosen Neutral Third Party (NTP), Plaintiffs moved the district court to hold the Department in contempt for alleged persistent violations of portions of the SEP.  In response, on November 19, 1999, Defendants filed a motion to dismiss on, inter alia, Younger abstention grounds. Plaintiffs then filed a motion to enforce on November 30, 1999.

On the basis of Younger, on March 21, 2000, the Court denied Plaintiffs' motions, granted Defendants' motion, and dismissed the action in its entirety.  In January 2002, the Tenth Circuit reversed the Court's blanket Younger-based dismissal and remanded for a provision-by-provision Younger review of the SEP.  Joseph A. ex rel. Wolfe v. Ingram, 275 F.3d 1253 (10th Cir. 2002) (Joseph A.), withdrawing and superseding on reh'g in part Joseph A. ex rel. Wolfe v. Ingram, 262 F.3d 1113 (10th Cir. 2001).[4]

The Court requested the parties provide it, by March 25, 2002, a provision-by-provision analysis of the SEP in accordance with the Tenth Circuit's opinion.  Plaintiffs replied by letter on

---

[3] A copy of the SEP is attached as Exhibit A to Defendants' Younger Analysis of Stipulated Exit Plan, filed Mar. 25, 2002 [Doc. No. 1601]. For simplicity's sake, in this Opinion the Court will cite to the SEP directly and not to Defendants' Exhibit A.

[4] Notwithstanding language in the Tenth Circuit's opinion that Younger mandates federal abstention from enforcement of "at least some of the SEP's provisions," Joseph A., 275 F.3d at 1272, because the issue was not briefed and "[t]he various SEP provisions may present complexities not apparent on the record before [it]," at the end of the day, the Tenth Circuit chose not to make a definitive holding but to remand the case for a determination by this Court of which SEP provisions do in fact violate Younger. Id. at 1273; see id. at 1257.

February 25, 2002.  Plaintiffs also filed on February 25, 2002, a motion to modify the SEP and to

affirm the remaining SEP provisions.  On March 25, 2002, Defendants filed a <u>Younger</u> Analysis

of the SEP, [Doc. No. 1601] (Defs.' <u>Younger</u> Analysis), and a motion to dismiss all SEP

provisions which remained enforceable after the Court's <u>Younger</u> analysis.  Plaintiffs' response

and Defendants' reply were responsive not only to Defendants' motion, but also to Defendants'

<u>Younger</u> analysis.

## II.    ABSTENTION/SEP REVIEW

With the exception of the SEP sections the parties agree have been exited or otherwise

agree are moot, the Court has reviewed each SEP provision to determine whether it violates

<u>Younger</u>, as construed in the Tenth Circuit's remand decision. Specifically, the Court looked at

each remaining SEP provision to determine whether it "requires interference with the operations

of the Children's Court" by expressly preventing Department employees "from recommending a

range of planning options for children" in the Department's custody and, thus, "for all practical

purposes" precludes the state court "from considering these options."  <u>Joseph A.</u>, 275 F.3d at

1268-69.  The Court also reviewed each remaining SEP section to determine if its enforcement

would interfere with an ongoing state proceeding or state court operations by prohibiting

Department counsel from freely "advocat[ing] for an outcome he or she believes is appropriate."

<u>Id.</u> at 1269.

## A.    Section I - Training

The parties disagree whether the Department has exited Section I (Training) of the SEP.

Defendants contend that the Department has done so. Defs.' <u>Younger</u> Analysis at 2-3 & nn.2-3

(citing <u>id.</u>, Ex. B at 3 (Compliance Rpt., July 1, 1999, through Sept. 30, 1999, submitted Mar. 30,

2000)) ("Considering the [NTP's] review of these documents and related interviews, exit from the

Training requirements is granted.")); see Defs.' Mot. to Dismiss at 1 n.1.  Plaintiffs do not agree.

In a footnote, Plaintiffs argue that Defendants had not exited Section I before the case was

dismissed by the Court on March 21, 2000.  Plaintiffs further argue that because the NTP

submitted her report after the case's dismissal, she had no authority to grant an exit under the

SEP. Pls.' Resps. at 3-4 n.2. Defendants reply that in 1999, before the Court dismissed the case,

the NTP provisionally granted the Department's exit from Section I[5]; the March 30, 2000, exit

was based on information for the third quarter, July-September 1999, provided before the case

was dismissed; the NTP could not review documents for a quarter before the quarter ended; and

the Tenth Circuit's remand of the case renders irrelevant the date of the NTP's exit approval.

Defs.' Reply at 1-2.

The SEP implicitly provides that during her contract period, the NTP would provide the

parties progress reports on the Department's compliance with the SEP, SEP Sect. VII(C), but

provides no explicit or implicit details for when or how often the NTP's reports would be

submitted to the parties or the legal effect of reports submitted after the NTP's contract expired

or dismissal of the case. The SEP also implicitly provides that (1) unless renewed, the NTP's

contract would expire on December 31, 1999; (2) further determinations after that date only

could be made by the NTP under a renewed contract, by another agreed upon substitute third

party, or, at the request of a party, by the district court. SEP Sect. VII(I). Pursuant to the SEP,

"for the period of the [NTP]'s contract, any decision by the [NTP] shall be final and not

---

[5] On May 26, 1999, "subject to remedial efforts consistent with" SEP Section VIII(E), the NTP
provisionally approved Defendants' exit from Section I. Defs.' Younger Analysis, Ex. C at 5-7
(Compliance Rpt. for Training & Staff Qualification).

appealable. . . .  The [NTP] shall be the sole determiner of compliance with the exit plan <u>during the period of the [NTP]'s contract</u>."  <u>Id.</u> (emphases added).

An "Exit Review Plan" Defendants submitted as an exhibit for another purpose provides details missing from the SEP. The NTP's compliance reports were to be "issued to the parties on a semi-annual basis in accordance with the [SEP]." Defs.' <u>Younger</u> Analysis, Ex. H at 2.  "The compliance report for the first and second quarters of the calendar year will be issued no later than September 30th of that same calendar year. Similarly, the compliance report for the third and fourth quarters will be issued no later than March 31st of the following year." <u>Id.</u>  However, as with the SEP, there is no explicit provision in the Exit Review Plan for the legal effect of a report submitted after the NTP's contract had expired or dismissal of the case. Additionally, although the Court presumes the Exit Review Plan was drafted by the NTP, <u>see</u> Defs.' <u>Younger</u> Analysis, Ex. A, SEP Section VII(B); Pls.' Resps. at Ex. 4, ¶ 4 (Sheila Agniel Aff.), it is undated and unsigned and gives no indication the parties approved its provisions.

In the first paragraph of her Compliance Report for April 1, 1999, through June 30, 1999, which was submitted December 7, 1999, the NTP states that her authority is limited to the term of her contract "which will expire on December 31[, 1999], as specified in the [SEP]."  Defs.' <u>Younger</u> Analysis, Ex. E at 1. The NTP continues "[a] limited extension of the contract has been executed to allow sufficient opportunity for monitoring [the Department's] compliance during the fourth quarter of 1999 and compiling a report on those findings for the parties." <u>Id.</u>  Defendants submitted Exhibit E for the purpose of evidencing that on December 7, 1999, the NTP granted the Department exit from SEP Section VI – not to demonstrate an extension by the parties of the NTP's authority for the fourth quarter. <u>See id.</u> at 10.  An executed extension of the NTP's

contract is not part of the record.

While there is some evidence the parties agreed that the NTP's final report for the year could be submitted after the NTP's contract had expired and still have legal effect and/or that the parties extended the NTP's contract for the sole purpose of her fourth quarter monitoring and report, the evidence is insufficient.  There also is no evidence that the parties intended any extension of the NTP's contract to include the third quarter, the quarter on which the NTP's March 2000 report and exit decision was based.  More importantly, on Defendants' motion, the Court dismissed the action (and the SEP) before the NTP approved the Department's Section I exit. The Court concludes, therefore, that the NTP's grant of the Department's exit from Section I on March 30, 2000, had no legal weight.

Having concluded that the Department has not exited Section I, the next query is whether Section I implicates Younger.  Neither party contends that the section violates Younger and, as explained below, the Court sees no Younger difficulty with it.[6]  Section I has four subsections. Subpart A concerns Pre-service Permanency Planning Training; Subpart B In-Service Training; Subpart C Supervisory Training; and Subpart D Adoption Consultants and Adoption Placement Workers In-Service Training.  The training requirements in Section I (or the federal court's monitoring of the Department's compliance with its provisions) place no restriction on the New Mexico Children's Court nor constrain the ability of the Department or its counsel to advocate freely in the state court.  Because Section I does not interfere with the operation of the Children's Court it poses no Younger problem and is enforceable.

---

[6] As a preliminary observation in Joseph A., the Tenth Circuit opined that the SEP Training section did not appear to risk interference with state court proceedings and, thus, did not appear to run afoul of Younger.  Joseph A., 275 F.3d at 1273.

**B.      Section II - Planning and Review**

Section II is the most embattled portion of the SEP.[7]  It has eight subsections: (A)

Assessment Planning; (B) Treatment Planning; (C) Available Permanency Planning Goals; (D)

Emancipation; (E) Long-Term Foster Care; (F) Return Home; (G) Permanency Plan Reviews; and

(H) NTP - Compliance. Plaintiffs do not challenge the Tenth Circuit's preliminary conclusion that

the first portion of Section II(D), as an express blanket limit on the Department and implicit limit

on the Children's Court, is "problematic in light of Younger," Joseph A., 275 F.3d at 1267-68.

Pls.' Mot. Modify & Affirm at 2, ¶ 3; see Pls.' Feb. 25, 2002, letter to district court. The

Department, however, goes further and contends that "none of the provisions" of Section II are

enforceable under Younger.  Defs.' Younger Analysis at 14.

Sections II(A) and (B) mandate: (1) the time frame for the Department's planning

conferences for a child in its custody or care; (2) that written assessment and treatment plans be

approved by a supervisor or County Office Manager; and (3) that the plans be specific rather than

general.  These subsections also list guidelines for determining the appropriateness of a plan, such

as the inclusion of identification of the reason(s) a child is in the Department's care or custody and

the establishment of a visitation plan. In contrast to the Original Consent Decree, and

notwithstanding the Tenth Circuit's preliminary view and the Department's argument to the

contrary, the planning conference guidelines in the SEP are guidelines only and not requirements.

See SEP Sect. II(H) ("The absence or presence in a particular plan of one or more of the items

listed as guidelines for defining the appropriateness of the plan shall not necessarily mean that the

---

[7]  In Joseph A., the Tenth Circuit offered as an off-the-cuff observation that "[p]articularly problematic in light of Younger" are (what the Court has inferred to be) SEP Sections II(A), (B), (D), (E), (F), and (G). Id. at 1267-68.

plan is inappropriate or appropriate."); see also Pls.' Resps. at 4 (citing Joseph A. v. NM Dep't of Human Servs., 575 F. Supp. 346, 356 (D.N.M. 1983) (Original Consent Decree provides, inter alia, the "plan shall set forth with specificity the reason for the child's entering HSD custody") (emphasis added)).

Whether Younger abstention is required as to Sections II(A) and (B), as well as other provisions of the SEP, turns on whether or not these provisions require or implicate federal judicial review of the Children's Court decisions and/or whether SEP compliance depends on the appropriateness[8] of the plans proposed or developed by the Department or those ordered by the Children's Court.  The SEP compliance review process consisted of a random selection of a set number of cases for review by the NTP and a three-member Exit Review Team (ERT) consisting of two Department employees and an external consultant.  Pls.' Resps., Ex. 4, ¶ 5 (Sheila Agniel Aff.). (When ERT members disagreed on whether a case complied with the SEP and could not work out their differences, the conflicting reviews where submitted to the NTP for decision. See Defs.' Younger Analysis, Ex. E at 2 (Compliance Rpt., Apr. 1, 1999, through June 30, 1999, submitted Dec. 7, 1999). As part of the review process, staff interviews also were conducted. See,

---

[8] The parties' negotiated definition of "appropriate" is:

> In deciding whether an act or plan is appropriate, the third party shall not substitute his/her judgment for that of the social worker.
>
> "Appropriate" shall mean fair, reasonable and timely standards of professional, competent social work practice.
>
> "Appropriate" does not necessarily mean the best decision or best plan; a determination as to whether an action is appropriate must be viewed as of the time of the action and shall not be affected by hindsight.
>
> An appropriate plan focuses on services and steps to promote improved conditions in the home and facilitate reunification or steps to achieve an alternative permanent plan but does not necessarily attempt to address every problem presented by the family.

SEP Sect. VIII(D)(1).

e.g., id., Ex. I at 2 (Corrected Compliance Rpt., Jan. 1, 1999, through Mar. 31, 1999, submitted Aug. 28, 1999).)  A child's case selected for review was found to be in compliance with Sections II(A) and (B) if:  planning conferences had been held in a timely fashion; a written assessment (or treatment plan) existed; the assessment plan had been developed within ten days of custody or prior to the child's ten-day custody hearing (and the treatment plan within sixty days of custody or prior to the sixty-day adjudicatory hearing); the plan was developed or approved by a supervisor or County Office Manager in a timely fashion; and the plan was considered by the reviewer to be child-specific and appropriate (as the term is defined in the SEP). See, e.g., Defs.' Younger Analysis, Ex. I at 2-3 (Corrected Compliance Rpt., Jan. 1, 1999, through Mar. 31, 1999, submitted Aug. 28, 1999); id., Ex. E at 4-5 (Compliance Rpt., Apr. 1, 1999, through June 30, 1999, submitted Dec. 7, 1999).

Contrary to Defendants' argument, Section II(A) and (B) do not explicitly, or indirectly through their timing requirements, constrain the options the Children's Court may choose in a child's case. Sections II(A) and (B) also do not categorically restrict the Department and its attorneys in what they may present or recommend to the Children's Court nor curtail the freedom, independence, or vigorousness of their advocacy. The provisions allow for the need to change or modify a child's plan and do not mandate what must be included in a plan. Sections II(A) and (B) are aimed at ensuring that the Department contemplates and plans its custody, care, and/or treatment of a child (including its recommendations for such to the Children's Court) in a manner consistent with timely, competent, professional social work practice.

Defendants also argue that the measurement of the Department's compliance with Section II(A) and (B) violates Younger because the NTP and/or the ERT (NTP/ERT) reviewed

10

for SEP compliance purposes the appropriateness of the plans ordered by the Children's Court. The record does not support Defendants' contention.

The NTP averred that the purpose of the ERT reviews was to measure for compliance purposes the Department's plans, not court-ordered plans.[9]  Pls.' Resps., Ex. 4 at ¶ 17 (Sheila Agniel Aff.). The NTP further averred that "CYFD employees, managers, administrators, including the ERT members[] and . . . Myrrl McBride, who was actively involved in the monitoring . . ., never expressed concern or advised that we may be reviewing court-ordered plans . . . ." Id. at ¶ 16; see id. at ¶ 15. Other documents submitted by Defendants as exhibits to

_____

[9] To support their contention that the SEP required evaluation of the appropriateness of court-ordered plans, Defendants attach two affidavits as exhibits to their reply.  In addition to both affidavits being untimely, the Court finds them unpersuasive.  In his supplemental affidavit, Myrrl McBride, the Department's Deputy Director of the Protective Services Division and manager of the ERT "during the time of the [SEP]", avers that "[t]he SEP process reviewed the court plan for appropriateness and resulted in a finding that the Court ordered plan was inappropriate." Defs.' Reply, Ex. C at ¶¶ 1,9. The Court is aware of no reason Mr. McBride's supplemental averments could not have been made in Mr. McBride's first affidavit (Defs.' Younger Analysis, Ex. J) nor any reason Mr. McBride's supplemental affidavit could not have been included with Defendants' other exhibits attached to their motion to dismiss. Alternatively, the Court is not persuaded by the evidence submitted by Mr. McBride in support of his supplemental affidavit (which is attached not to his supplemental affidavit, but to Defs.' Reply, Ex. D, the supplemental affidavit of Maryellen Strawniak). The exhibit is an October 1999 Permanency Planning Goals & Review form, dated November 12, 1999, for a specific child. The child's treatment plan was found by the reviewer to be inappropriate, but court-ordered. There is no evidence on the record, however, that this plan was tabulated as part of a SEP compliance report. (In fact, there is no evidence NTP compliance reports exist for case reviews after September 30, 1999.) Finally, that a court-ordered case plan was found to be inappropriate by an ERT member does not automatically mean, or evidence, that the plan was tabulated as inappropriate for purposes of SEP compliance or that court-ordered plans generally were tabulated for SEP compliance purposes.

Defendants also provide no explanation why the final affidavit attached to their reply, that of Tracy Fava, could not have been attached to their motion to dismiss.  Further, the Court is confused by Ms. Fava's averment that "[f]rom 4/99 to 4/01[, she] worked for the Exit Review Team established by Sheila Agniel [the NTP]." Id., Ex. E at ¶ 2. Ms. Agniel's contract expired December 31, 1999, and, while possibly briefly extended, was not renewed. After the Court's March 21, 2000, opinion dismissing the action, the Department treated the SEP as not in effect. More importantly, like Mr. McBride, Ms. Fava does not aver that inappropriate court-ordered plans were counted against the Department for SEP compliance purposes.

their <u>Younger</u> Analysis evidence that the plans reviewed by the NTP/ERT were, in fact, plans

approved (or which were required to have been approved) by a Department supervisor or County

Office Manager, not the Children's Court.  <u>See</u>, <u>e.g.</u>, Defs.' <u>Younger</u> Analysis, Ex. I at 2-3

(Corrected Compliance Rpt., Jan. 1, 1999, through Mar. 31, 1999, submitted Aug. 28, 1999); <u>id.</u>,

Ex. E at 4-5 (Compliance Rpt., Apr. 1, 1999, through June 30, 1999, submitted Dec. 7, 1999).

Further evidence that permanency plans are considered a Department-matter, and not solely a

Children's Court issue, is a Department policy on available permanency plan options, two of

which require prior Director approval.  Pls.' Resps., Ex. 7 at 5-53 to 5-54 (CYFD PR 5.3.10.1 -

Permanency Plan Categories dated 1/1/91). Additionally, in a case reviewed by the NTP/ERT

where the child's plan was found to be inappropriate, but was ordered by the Children's' Court

against the recommendation of the Department, the plan was deemed compliant for purposes of

the compliance review report.  Defs.' <u>Younger</u> Analysis, Ex. B at 6 (Long Term Foster Care)

(Compliance Rpt., July 1, 1999, through Sept. 30, 1999, submitted Mar. 30, 2000).[10] (An

inappropriate case plan also was deemed SEP complaint by the NTP/ERT because the plan had

been approved by a "social work consultant supervisor."  <u>Id.</u>)  Moreover, continuous compliance

review findings of inappropriate assessment and treatment plans were considered supportive of

the NTP's prior recommendations for additional training on the development of appropriate

assessment and treatment plans – training for Department employees, not for the Children's

Court.  <u>See id.</u>, Ex. E at 3; <u>id.</u>, Ex. C at 5 (Compliance Rpt., Training & Staff Qualifications, May

---

[10]  The NTP did state in her July-September, 1999, Compliance Report that the circumstances of the
noted inappropriate Court-ordered plan "raises troubling questions about the implementation and
interpretation of [the Adoption and Safe Families Act of 1997] in local jurisdictions [and] raises the issue
of whether [the Department] has undertaken sufficient steps to educate the local Children's Courts on
appropriate permanency planning . . . ." Defs.' <u>Younger</u> Analysis, Ex. B at 6.

26, 1999).[11]

Finally, Defendants contend that Department employees restricted the permanency plans they developed or recommended to those they thought would be found SEP compliant by the NTP/ERT. Defendants support their contention with the affidavit of the Department's Protective Services Division Director during the time the SEP was in effect. Defs.' <u>Younger</u> Analysis, Ex. G at ¶ 4 (Maryellen Strawniak Aff.). Defendants' argument borders on the absurd. Why would the Department negotiate and execute a consent decree with which it did not want its employees to attempt to comply?  Moreover, Department employees' proposal of plans they felt would be viewed by the NTP/ERT as SEP compliant is not equivalent to federal court review of the Children's Court's decisions.

The Court concludes that enforcement of Sections II(A) and (B) requires no federal interference with the operations of the Children's Court, either directly or indirectly. Enforcement of Sections II(A) and (B), thus, is not preempted by <u>Younger</u>.

Section II(C) of the SEP provides for the "available permanency planning goals": Adoption, Emancipation, Maintenance at Home, Permanent Guardianship, or Long Term Foster Care.  The Department contends that Section II(C) violates <u>Younger</u> because it restricts the available planning goals to the six goals listed, "effectively precluding the state court from considering other options."  Defs.' <u>Younger</u> Analysis at 11.  Plaintiffs respond that the listed goals are the only goals that were available and permissible under Department policy at the time the

---

[11] The SEP's definition of "appropriate" provides that the NTP shall not substitute her judgment for that of the <u>social worker</u>, SEP Sect. VIII(D)(1). From the absence in the definition of any mention of Children's Court decisions, the Court infers that the parties did not expect SEP compliance or enforcement to entail NTP review of the appropriateness of decisions made by the Children's Court.

SEP was negotiated and filed, cf. Pls.' Resps., Ex. 7 at 5-53 to 5-54 (CYFD PR 5.3.10.1 - Permanency Plan Categories dated 1/1/91),[12] and that Section II(C) was written to be in compliance with Department policy.

Section II(C) is a limit the Department imposed on itself to insure the SEP's available planning options were in accordance with the Department's own policy limitations. Section II(C) does not limit the Department in its advocacy ability any more than the Department has already limited itself in its policy. Section II(C) also does not restrict the Children's Court ability to order on its own a permanency plan option not listed in Section II(C) (or in Department policy). As the Court has found earlier, the SEP does not require, nor is there any evidence, that court-ordered permanency plans be compliant with the SEP for purposes of SEP compliance monitoring and section exit. And as Plaintiffs point out, if the Department's policy has changed since the SEP was executed, the Department may move to modify Section II(C).  Federal monitoring of the Department's compliance with or enforcement of Section II(C) will tread neither on the operations of the Children's Court nor on the ability of Department (or its counsel) to advocate freely. Therefore, Section II(C) does not compel abstention under Younger.

Section II(D) flatly prohibits the Department from establishing Emancipation as a planning goal for children who are twelve years of age or under, unless court-ordered against the

---

[12] PR 5.3.10.1 also lists as permanency plan categories: "Maintain at Home," "Legal Guardianship" (under the state probate code), and "Time-Limited Foster Care" (when available and only with Director approval). Pls.' Resps., Ex. 7 at 5-53 to 5-54 (CYFD PR 5.3.10.1 - Permanency Plan Categories dated 1/1/91). Emancipation is titled "Semi-Independent Living/Emancipation" and a plan of Long Term Foster Care is limited to when available and only with Director approval. Id.  Neither party raises the differences between PR 5.3.10.1 and SEP Section II(C) or contends that these differences are of significance. Additionally, neither party argues that changes to PR 5.3.10.1, or any current policy, are relevant as to Section II(C).

Department's documented recommendation.[13]  Section II(D) also requires that counseling for a child twelve through fourteen years of age be provided before Emancipation may be established as the plan for the child.[14]  The parties explicitly agree with the Tenth Circuit's preliminary opinion that the portion of Section II(D) which categorically prohibits the Department from establishing Emancipation as a planning goal for foster children who are twelve years of age or under violates Younger because it interferes with the operation of the Children's Court by expressly prohibiting the Department, or its counsel, from recommending or advocating a specific planning option to the Children's Court, see Joseph A., 275 F.3d at 1267-69. A review of this portion of Section II(D) by the Court, therefore, is moot.

The parties did not brief the issues as to whether the remaining portion of Section II(D) (requiring that before the Department may establish Emancipation as a permanency planning goal for a child between the ages of twelve and fourteen years, the child receive counseling) also violates Younger. The Court finds no Younger problem with this portion of Section II(D). The requirement that children ages twelve through fourteen receive counseling, which may be provided by a licensed social worker, before such a goal is established is no different in essence than, for example, a requirement that the Department perform a home study before a child is

---

[13] (The SEP ban on Emancipation for children twelve years of age and younger was not a limit imposed by Department policy. Cf. id. ) The Department states in its response to Plaintiffs' motion to affirm and to modify the SEP that the Department has "continued to progress."  Defs.' Resp. at 7 n.4.  "The term 'Emancipation' is no longer in policy." Id.  Instead, there are now "Planned Permanent Living Arrangements," which, according to the Department, is not equivalent to Emancipation, but "broader."  Id. The Department concludes that "the absence of a current policy on Emancipation . . . suggests the entire provision [Section II(D)] is obsolete."  Id.  Plaintiffs do not reply to this point. Defendants also do not seek to modify Sections II(C) or (D) to reflect this asserted policy change and resulting obsoleteness.

[14] The parties do not explain or raise the inconsistency created by the overlapping portions of Section II(D)'s applicable to twelve year old children.

placed in an adoptive home. Any constraint on the Department is one of process, not endpoint, and has no impact on the operation of the Children's Court.

Section II(E) precludes the Department from proposing a permanency planning goal of Long Term Foster Care for a child if (1) another appropriate permanency planning goal(s) exists for the child and (2) there is no documented approval by the social worker consultant supervisor for the goal of Long Term Foster Care. It is established professional social work belief that Long Term Foster Care should be considered an appropriate permanency planning goal only as a last resort, and that if any other appropriate permanency goal exists, it should be selected first. See Pls.' Resps. at 10-11 (citing Nancy C. McDaniel, et al., Options for Permanency: An Overview (1997) and Pls.' Resps., Ex. 8).  Defendants contend that Section II(E) is not enforceable under Younger because it controls or limits what may be presented to the Children's Court. The Court disagrees. The Department is free to select, and its counsel is free to recommend to the Children's Court, Long Term Foster Care as a permanency planning goal for a child if such a goal is the most appropriate one for the child, as evidenced by approval of the goal by the social worker consultant supervisor. Section II(E) does not preclude the Department "ever from presenting" (or selecting) Long Term Foster Care as a planning option, and, thus, does not implicate Younger.  Joseph A., 275 F.3d at 1268.

Section II(F) provides that, unless special circumstances exist, a foster child "should not have a plan of Return Home for more than 15 of the most recent 22 months." Section II(F) then lists three examples of  "special circumstances" (examples which are explicitly nonexclusive): the child is in a relative's care, the child's case plan documents a compelling reason that Return Home is in the child's best interests, or the plan is court-ordered, against the Department's documented

16

recommendation. As with Section II(E), the Court is not persuaded by Defendants' contention or evidence that Section II(F), in violation of <u>Younger</u>, restricts the Children's Court options and results in "direct federal oversight."  Defs.' <u>Younger</u> Analysis at 12.  Section II(F) does not restrict the Children's Court options in any way – even if the Department has documented its reasons against a plan of Return Home. Further, for a child who has been in foster care for more than 15 of the most recent 22 months, the Department is not categorically prohibited from choosing, or advocating, a permanency plan goal of Return Home.  If a child is in the care of a relative and has been in foster care for more than 15 of the most recent 22 months, a permanency plan goal of Return Home may be chosen for the child by the Department without any restriction. If a child has been in foster care for 15 of the most recent 22 months and the Department believes a permanency plan goal of Return Home to be in the child's best interests, as documented by compelling reason in the child's case plan, the Department also is free to choose such a goal or to recommend the goal to the Children's Court.  The requirement of a documented "compelling reason" is one of process not endpoint and is intended to ensure that the child's best interests are realized.  Finally, Section II(F) allows for the possibility of other "special circumstances" in which a continuous Return Home plan for a child for more than 15 months would be appropriate. Because Section II(F) is not a blanket prohibition of a permanency goal, does not muzzle the Department's freedom to advocate or otherwise interfere with the operation of the Children's Court, no <u>Younger</u> problem will ensue from its enforcement. See <u>Joseph A.</u>, 275 F.3d at 1268-69.

Section II(G) provides that every six months after an adjudication or disposition in a child's case, the Department must review the child's permanency plan for appropriateness.

Contrary to Defendants' argument,[15] enforcement of this provision does not require that the federal court determine whether the plans approved by the Children's Court are appropriate. Compliance with Section II(G), as with other SEP provisions, is determined through a random sampling of cases by the NTP/ERT. A case was considered to be Section II(G) compliant if the child had a current treatment plan, the plan had been reviewed every six months, and the current plan (if existing) was appropriate.  See, e.g., Defs.'Younger Analysis, Ex. B at 7 (Compliance Rpt., July 1, 1999, through Sept. 30, 1999, submitted Mar. 30, 2000). The focus of Section II(G) is whether children's plans were being reviewed regularly to ensure they remained appropriate and not the appropriateness of a Children's Court decision ordering any current plan or a previous plan six months earlier.  Moreover, there is no SEP requirement (or indication) that plans found to be inappropriate by the reviewers be (or were) altered.  Section II(G) does not interfere with state court operations or the ability of counsel to advocate in state court.  Its enforcement, therefore, does not require federal abstention under Younger.

Section II(H) mandates that the Department provide the NTP with information enabling her to monitor Department compliance with Section II.  Section II(H) also details what is required for the Department to exit Section II.  Specifically, for four consecutive quarters, the Department must demonstrate 90% compliance and must demonstrate "that at least 90% of the assessment plans and 90% of the treatment plans are appropriate." SEP Sect. II(H).  The absence or presence of listed guideline items in a plan is not definitive on the issue of "appropriateness." Id.  The NTP

---

[15] The Department contends without citation to supporting evidence that "SEP §II(G) was construed by the NTP as requiring an independent determination of 'appropriateness' of Court plans by the NTP.  All of the NTP reviews occurred after Court hearings."  Defs.'Younger Analysis at 4.  Defendants' contention not only lacks citation to the record, but is contrary to the parties' agreed upon definition of "appropriate." SEP Sect. VIII(D)(1).

is required to use her "professional judgment in determining whether the plans are appropriate." Id.; see SEP Sect. VIII(D)(1). The Court finds that Section II(H) is procedural in nature and raises no Younger concerns.

## C.  Section III - Adoption

Section III, governing adoptions, has five subsections: (A) covers when a child's permanency goal is changed to Adoption; (B) covers a child in a conversion home[16] with a plan of Adoption; (C) covers a child with a plan of Adoption; (D) covers Adoption home studies; and (E) covers Department adoption services contracts with private agencies.

Section III(A)(1) provides that within ninety days from the date a child's permanency plan is changed to Adoption, the Department must file all motions necessary to terminate parental rights. The Department contends that this provision violates Younger because it limits its flexibility and interferes with its ability to present options to the Children's Court. The Court is unconvinced. Section III(A)(1) does not mandate a decision to change a child's permanency plan to Adoption. It merely requires that within three months of such a change in a child's plan, the Department file a motion to terminate parental rights. (Adoption of a child cannot occur without parental rights first being terminated.) Further, Section III(A)(1) does not require the Children's Court to do anything, such as rule on the motion to terminate within a certain time period. Finally, if circumstances change and a permanency plan of Adoption is no longer in the child's best interest, the Department and/or the Children's Court are free to alter the child's permanency

---

[16] A conversion home is the foster home in which the child resides and which has expressed a desire to adopt the child. SEP Sect. VIII(D)(5). The "conversion" home officially is not considered an adoptive resource for the child until the foster parents sign a non-binding commitment to be such an adoptive resource (i.e., the placement agreement). Pls.' Resps. at 16 n.11.

plan and select a new goal. Cf. Pls.' Resps., Ex.7 at 5-54 (CYFD procedure 5.3.10.1) (term

"permanency plan" refers to goal of permanency for child, not that plan itself is permanent; plan

can "and often will" change over time). Enforcement of Section III(A)(1) does not implicate

Younger.

Section III(A)(2), like Section II(H), is procedural. It states that the Department must

provide the NTP with acceptable information to allow her to monitor compliance with Section

III(A) and specifies the compliance requirements for purposes of exiting Section III(A).

Consequently, Section III(A) poses no danger of violating Younger and is enforceable.

Section III(B)(1) provides that for a child who has a plan of Adoption and is in a

conversion home, within sixty days of the child being freed for adoption, a placement agreement

must be signed by the proposed adoptive parents (i.e., the child's foster parents). If a placement

agreement is not signed within sixty days from the date the child is freed for adoption, Section

III(B)(1) requires the social worker to refer the child's case to the Central Adoptions Unit,

pursuant to Section III(C). The Department argues that Section III(B)(1) violates Younger

because it is required to refer a child's case to the Central Adoptions Unit if two months pass after

a child has been freed for adoption and the conversion home has not signed a placement

agreement. The Court is unconvinced.

By state statute, once the Children's Court terminates parental rights, the child is freed for

adoption.[17] See, e.g., N.M. Stat. Ann.§§ 32A-4-28(A),(F); 32A-5-3(O) (2001 Cum. Supp.). A

---

[17] The Department raises the hypothetical spectre of foster parents who delay signing a placement agreement out of fear that the termination of parental rights will be reversed on appeal. If parental rights were not legally terminated, then the child was not legally freed for adoption. While this may be a risk the foster parents have to take, it raises no Younger concerns.

placement agreement does not legally bind the conversion home and is used for  permanency

planning purposes only.  A referral to the Central Adoptions Unit under Section III(B)(1) does

not require the end of consideration of the conversion home as an adoptive home nor require

removal of the child from the conversion home.  Contrary to the Department's argument, Section

III(B)(1) does not restrict the arguments counsel may present to the Children's Court.  Section

III(B)(1) also does not require the Department to act in a way not in a child's best interest.  The

referral requirement merely ensures concurrent planning, in accordance with state and federal

statutes. See, e.g., N.M. Stat. Ann. § 32A-4-29(J) (2001 Cum. Supp.) ("When a motion to

terminate parental rights is filed, the department shall perform concurrent planning."); 42 U.S.C.

§§ 675(5)(E) (concurrent adoption planning to occur when motion to terminate parental rights

filed); 671(a)(15)(F) (authorizing concurrent planning), 673b(i)(2)(b) (adoption technical

assistance to include concurrent planning models).[18]

Section III(B)(2) requires the Department provide the NTP with the information necessary

for her to monitor compliance with Section III(B)(1) and provides the exit requirement for

Section III(B). Defendants raise no specific Younger challenge to Sections III(B)(2).  The court

finds that Section III(B)(2) is not substantive in nature.

Because neither Section III(B)(1) nor (B)(2) interfere with the operations of the state

---

[18] Concurrent planning helps prevent having a child sit for months, if not longer, in a home which may turn out to be an adoption dead-end, denying the child timely permanency. The Department has three months from the date Adoption is established as the child's permanency plan to file a motion to terminate parental rights. It then has two months from the date the child is freed for adoption (i.e., court-ordered termination of parental rights) to secure a placement agreement from the child's foster/prospective adoptive parents before referring the child's case to the Department's Central Adoption Unit. Further, under the SEP, intense, individualized recruitment for a child by an adoption specialist is not required until three months have passed since the child was freed for adoption.  SEP Sect. III(C)(2).

court nor impair the Department's ability to advocate, the Court finds that Section III(B) does not implicate Younger.

Section III(C)(1) provides that within thirty days of a referral pursuant to Section III(B)(1) or if a child is not in a conversion home, within thirty days of the child being freed for adoption, "the Central Adoptions Unit (CAU) will send at least one and, if possible, up to three home studies of appropriate prospective families to the child's caseworker" or a recruitment plan will be developed. SEP Sect. III(C)(1).  Section III(C)(2) states that if no match is found within three months of a child's being freed for adoption, the child's case "will be assigned to the caseload of the adoption recruitment specialist" to conduct an "intensive, individualized recruitment for the child." SEP Sect. III(C)(2).  Section III(C)(3) requires the Department provide the NTP with the information necessary for her to monitor compliance with Section III(C) and provides the exit requirement for Section III(C). Section III(C) poses no Younger threat to the authority of the Children's Court nor restricts the recommendations the Department or its counsel may make to the Children's Court.  Section III(C) is relevant only after a child has been freed for adoption by the Children's Court and, in fact, effectuates the Children's Court termination goal of adoption for a child.

Finally, whether Section III(D) and (E) violate Younger is a moot query. Defendants concede that Section III(D) does not interfere with the operations of the Children's Court and that Section III(E) "does not impose substantive limits" and "is not an independent provision" requiring its own Younger review.  Defs.' Younger Analysis at 19.

**D.     Section IV - Information and Records System**

The parties agree that Section IV is enforceable under Younger. The Court sees no reason

to find otherwise. Therefore, federal abstention as to the enforcement of Section IV of the SEP is not required.

**E.      Section V - Staff Qualifications**

In November 1998, the Department exited from Section V of the SEP regarding staff qualifications of social work consultants. See, e.g., Defs.' Younger Analysis at 3 nn.4, 6; id., Ex. D at 7 (Compliance Rpt., Nov. 3, 1998, Training & Staff Qualification); Pls.' Resps. at 3 n.2; Joseph A. v. Hartz, 80cv623 JC/DJS, (D. N.M., June 28, 2000), slip op. at 4 (Doc. No. 1592). Notwithstanding the Department's exit of Section V, Plaintiffs contend in a footnote that the Department has attempted to violate the spirit of this section (and the state statutory requirement that child welfare social workers be licensed social workers) by requesting the State Personnel Office allow it to fill positions traditionally held by social workers with non-licensed persons without social work degrees.  Pls.' Resps. at 3 n.2 (citing Ex. 3 at 5 ¶13 and attached Jan. 30, 2002, letter from Diane Garrity to Gip Brown). Be this as it may, the Department exited Section V in 1998 and, under the SEP, the Court cannot revisit the NTP's decision granting the exit. See SEP Sect. VII(I) (during contract period, decision of NTP is final and not appealable). Cf. SEP Sect. VII(K) (section exit relieves Defendants from strict requirements of that section).  The applicability of Younger to Section V of the SEP, therefore, is moot.

**F.      Section VI - Citizen Review Boards for Substitute Care**

Defendants contend that the Department has exited Section VI of the SEP. Defs.' Younger Analysis at 1, 2-3. While Plaintiffs did not respond to this contention nor explicitly

disagree, Pls.' Resps. at 3-4 n.2,[19] the record supports Defendants' contention, Defs.' <u>Younger</u>

Analysis, Ex. E at 3 (Compliance Rpt., Apr. 1, 1999, through June 9, 1999, submitted Dec. 7,

1999). Consequently, whether Section VI violates <u>Younger</u> is moot.

### G.    Section VII - Neutral Third Party Review and Exit Procedure and Section VIII - Miscellaneous

Section VII has twelve subsections. The subsections concern the identity of the NTP and

her budget; the NTP's development of an Exit Plan after consultation with the parties; the NTP's

authority to gather information; the NTP's SEP progress reports; SEP section exit procedures and

exit implications; Plaintiffs' rights to SEP progress information; when the Court may discharge the

NTP; what is to occur on December 31, 1999, regarding further third party review or necessary

court determinations; the NTP's authority and finality of the NTP's decisions during the period of

her contract; quarterly meetings between the NTP and the parties; and the Court's continued

jurisdiction.

Section VIII concerns issues relating to changes in the law which make (or anticipated

changes which would make) Defendants' compliance with the SEP impossible or to the

Department finding compliance to be impracticable, and the timing of Defendants' notification of

such to Plaintiffs. In addition, Section VIII provides that either party may bring a Fed. R. Civ. P.

60 motion to modify the SEP and that after December 31, 1998, the SEP may not be deemed,

among other things, a waiver of rights or defenses. Section VIII also provides definitions of

certain terms used in the SEP, such as "Quarter," "Section," and "Appropriate."

The Department admits that Sections VII and VIII impose no duties independent of the

---

[19] In their motion to modify and amend, Plaintiffs request that Section VI be "simply delet[ed] . . . to reflect that the requirement has been codified in state law." Pls.' Supp. Mem. at 4.

SEP's other sections.  Defs.' <u>Younger</u> Analysis at 4.[20]  The Court agrees that enforcement of

Sections VII and VIII poses no independent risk of violating <u>Younger</u>.

## H.      Conclusion

With the exception of the first portion of Section II(D), which the parties agree violates

<u>Younger</u>, and Sections V and VI, from which the parties agree (and the record supports), the

Department has exited, the SEP remains enforceable.

## II.     PARTIES' MOTIONS

In addition to offering their views of the SEP's enforceability under <u>Younger</u>, both parties

filed motions.  Plaintiffs move the Court under Fed. R. Civ. P. 60(b) and <u>Rufo v. Inmates of</u>

<u>Suffolk County Jail</u>, 502 U.S. 367 (1992), to modify the SEP and to affirm the remaining sections

of the SEP.  Specifically, Plaintiffs seek to amend the first portion of Section II(D) of the SEP.[21]

Plaintiffs base their Rule 60 request on what they allege is the change in <u>Younger</u> abstention law

created by the Tenth Circuit's most recent opinion in <u>Joseph A.</u>  For their part, Defendants move

the Court, under Fed. R. Civ. P. 60(b)(5) and <u>Rufo</u>, to dismiss any provisions of the SEP which

remain enforceable after the Court's analysis under <u>Younger</u> and the Tenth Circuit's <u>Joseph A.</u>

opinion.[22]

---

[20] The Tenth Circuit implicitly opined that Sections VII and VIII appeared to be procedural, presenting no <u>Younger</u> problem.  <u>See Joseph A.</u>, 275 F.3d at 1273.

[21] Plaintiffs also request that the SEP be modified by the deletion of Section VI (Citizen Review Boards) because Section VI's requirement has been codified in state law.  Although it is unclear whether this remains a live issue, as Defendants did not respond to this request nor Plaintiffs raise the issue again in their reply, Plaintiffs' request to delete Section VI is moot. As stated above, the Department has exited Section VI and it is no longer enforceable.

[22] Neither party invokes, or previously has invoked, Section VIII of the SEP. Section VIII(A) provides relief for when a change in law , actual or anticipated, renders Defendants' compliance with any part of the SEP impossible or for when Defendants' compliance becomes impracticable. Section VIII(B) provides that

**A.      Standard of Review**

A party may be relieved from a final judgment or order if its prospective application ceases to be equitable, Fed. R. Civ. P. 60(b)(5), "not when it is no longer convenient to live with terms of [an institutional reform] consent decree." Rufo, 502 U.S. at 383. The party seeking relief through modification of an institutional reform consent decree bears the burden of establishing that such relief is warranted by "a significant change in circumstances." Id. "A party seeking modification of a consent decree may meet its initial burden by showing either [sic] a significant change either in factual conditions or in law." Id. at 384. Examples of a change warranting relief are changed factual conditions making compliance "substantially more onerous," id., a change in law making one or more of the consent decree obligations impermissible, id. at 388, or a change in the statutory or decisional law making "legal what the decree was designed to prevent," id. Rule 60(b) relief also may be warranted if the parties' agreement was based "on a misunderstanding of the governing law." Id. at 390. A clarification of the law, however, does not automatically warrant such relief. Id. at 389-90. Finally, modification generally should be denied where the relied upon change in circumstances was foreseen or anticipated by the moving party at the time it entered the consent decree. Id. at 385-86. "If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." Id. at 385.

---

"[e]ither party may request the Court modify any provision of this Exit Plan as provided in Fed. R. Civ. P. Rule 60."

If the moving party meets its initial burden, the next step is for the court to "consider whether the proposed modification is suitably tailored to the changed circumstance." Id. at 383. In evaluating the proposed modification, a court must keep in mind three constraints. First, the proposed modification should not violate or defeat the consent decree's basic purpose. Id. at 387. Second, the proposed modification "must not create or perpetuate a constitutional violation" nor should it "strive to rewrite a consent decree so that it conforms to the constitutional floor." Id. at 391. Rather, the focus of the court's consideration of the proposed modification should be on whether it "is tailored to resolve the problems created by the change in circumstances." Id. Third, "[a] court should do no more, for a consent decree is a final judgment that may be reopened only to the extent equity requires." Id.

Defendants' motion to dismiss will be construed, pursuant to Rule 60(b) and Rufo, as a motion for modification or for relief from judgment rather than as a motion to dismiss or, pursuant to Rule 12(b), as a motion for summary judgment. If granted, Defendants' motion would moot Plaintiffs' motion. Consequently, the Court begins its analysis with Defendants' motion.

**B.      Defendants' Motion to Dismiss**

Defendants request dismissal of any portion of the SEP enforceable under Younger. (In their motion, Defendants assume the Court would find enforceable only two provisions of the SEP, Sections III(D) and (IV).)  In support of their requested relief, Defendants contend, generally and as to Sections III(D) and (IV) of the SEP specifically, that the Adoption and Safe Families Act of 1997 (ASFA), 42 U.S.C. §§ 602 through 607, and the adoption in 2000 of federal regulations (the 2000 Regulations), 45 C.F.R. pt. 1355, are significant changes in the law. "[T]he ASFA created an audit system that not only subsumes the terms of the SEP, but expands the

27

reporting, review and monitoring of the Defendants through a federal agency," the Department of Health and Human Services (DHHS). Defs.' Mot. Dismiss at 3; id. at 8.  The ASFA and the 2000 Regulations focus on outcomes "instead of measuring compliance by process timelines, as does the SEP."  Id. at 5.  Consequently, Defendants argue the ASFA and the 2000 regulations render the SEP moot.  Defendants further contend that if the SEP were to remain in effect, the Department would be monitored through it and by the DHHS, "impos[ing] an undue and unanticipated financial burden, as well as a more onerous burden [of complying] with two sets of standards and two masters."  Defs.' Mot. Dismiss at 3; id. at 12 (To require the Department's compliance with the SEP would tear the Department "in two separate directions," duplicating and, ultimately, wasting resources.).  Defendants' second basis for relief under Rufo is that the change in law was unanticipated and, as to the 2000 regulations specifically, that there was no way they could have foreseen during the SEP negotiations their extensiveness and impact. (Defendants do not contend that since the SEP was filed in February 1998 that there has been a change in law making impermissible what was required by the SEP or making legal what was impermissible under the SEP.  Defendants also do not contend that the SEP was based on Defendants' misunderstanding of the governing law.)  Plaintiffs respond that the ASFA and the 2000 regulations do not represent a change in law and were either known or foreseen. Additionally, Plaintiffs contend that Defendants' proposed modification, complete dismissal, is not narrowly tailored to the alleged changed circumstances.

In 1980, Congress enacted the Adoption Assistance and Child Welfare Act (AACWA), §§ 42 U.S.C. 670 et seq., as an amendment to Titles IV-B and IV-E of the Social Security Act, to assist reformation of state and tribal welfare systems, including expediting permanency for foster

children. State child welfare agencies receiving federal funds were required to comply with the AACWA; were monitored; and, if need be, financially penalized under the Act.  In 1994, because of "a general dissatisfaction with the performance of State child welfare systems in achieving" AACWA's goals of safety, permanency, and child and family well-being, the DHHS through federal legislation commenced revamping the AACWA.  See 65 Fed. Reg. 4020, 4021 (Jan. 25, 2000) (codified at 45 C.F.R. pts. 1355-1357 and attached at Pls.' Resps., Ex. 12); see also Defs.' Mot. Dismiss, Ex. B-2 at 2.  The ASFA was enacted on November 17, 1997. See P.L. 105-89; 65 Fed. Reg. at 4020. It seeks "to provide States with the necessary tools and incentives to achieve the original goals of [AACWA]," 65 Fed. Reg. at 4020, including adding such concepts as concurrent planning, set time limits, and financial incentives.  Prior to and after the ASFA's 1997 enactment, and prior to the publication of the September 19, 1998, notice of proposed rulemaking (NPRM) and request for public comment, DHHS notified the states and consulted extensively with the child welfare field. See id. at 4021.  For example, from 1995 to 1998,  DHHS conducted in-depth, on-site pilot projects; "[s]hortly after the enactment of the ASFA[, DHHS] held focus groups in Washington, D.C., and in each of the 10 Federal regions to obtain input from the field on the implementation of the new law;" and prior to developing the September 1998 NPRM, the DHHS "conducted a series of focus groups . . . with representatives of State programs and national organizations and with family and child advocates."  Id.  On January 25, 2000, federal regulations were promulgated in final form, effective March 27, 2000. See Defs.' Mot. Dismiss, Ex. B-2.

In addition to the above amending laws and regulations and pursuant to Titles IV-B and IV-E and 42 U.S.C. § 679 (§ 479) of the Social Security Act, in late 1993, final rules were

published for a federal mandatory reporting system for collection of foster care and adoption data,

generally known as the Adoption and Foster Care Analysis and Reporting System (AFCARS). 58

Fed. Reg. 67912 (Dec. 22, 1993) (codified at 45 C.F.R. pt. 1355); see 60 Fed. Reg. 40505, 40505

(Aug. 9, 1995); Defs.' Reply, Ex. B at 4.  States were required to implement a system that could

collect AFCARS data by October 1994 and to electronically report the data by May 1995. 45

C.F.R. § 1355.40(a),(b). AFCARS is specifically referenced in the ASFA. See, e.g., 45 U.S.C. §

679b(2) (outcome measures should be developed from data available from AFCARS).

Amendments made to ASCARS after the execution of the SEP (i.e., in the 2000 regulations) were

"technical changes to the race and ethnicity data elements." 65 Fed. Reg. 4020, 4020 (Mar. 27,

2000).

      Defendants' general argument can be boiled down to that the "one main difference"

between the ASFA and the SEP is  . . . the ASFA relates to measuring outcomes . . . while the

SEP gauges process[] deadlines or steps to show work completed" and that this is a significant

difference creating an undue burden. Defs.' Mot. Dismiss at 13; id. at 5.  The record does not

support Defendants' contention and the Court sees no reason why the Department's compliance

with both the SEP and the ASFA (and the 2000 regulations) would be substantially onerous. The

ASFA (and 2000 regulations) are consistent with Defendants' obligations under the SEP.

Compare e.g., 42 U.S.C. § 675(5)(B) (status of child is to be reviewed periodically but no less

frequently than once every six months) with SEP Section II(G) (Department shall review child's

permanency plan for appropriateness every six months). Further, the SEP's goals are implicit in,

consistent with, and facilitate the goals of the ASFA.  Rather than constituting an inequitable

burden, compliance with the SEP will complement Defendants' compliance with the ASFA (and

the 2000 regulations) and vice versa.

Even assuming the outcome compliance approach of the ASFA and the 2000 regulations generally constitutes a significant and onerous change from previous law, it was known, or should have been anticipated, at the time of the SEP's execution. The 1997 ASFA was enacted during the SEP negotiations and the record supports that the parties explicitly took it into account when negotiating the SEP, compare, e.g., SEP Sect. II(F) with 42 U.S.C. § 675(5)(E) and SEP Sect. II(G) with 42 U.S.C. § 675(5)(B). The Court is unpersuaded that when the parties negotiated and executed the SEP, Defendants did not foresee (or could not have foreseen) the impact of the ASFA and the 2000 regulations. The ASFA explicitly states that the focus of compliance measures would be on outcomes, such as the number of adoptions. The ASFA further provides that final regulations under it would soon be promulgated – with State input, based on AFCARS data, and implementing ASFA's focus on outcome measures.  See, e.g., 42 U.S.C. § 679b (The "Secretary, in consultation with Governors, State legislatures, State and local public officials responsible for administrating child welfare programs, and child welfare advocates, shall – (1) develop a set of outcome measures (including length of stay in foster care, number of foster care placements, and number of adoptions). . . ."); id. § 679b(2) (outcome measures to be developed from AFCARS data); id. § 679b(3)-(5) (States' performance rating system to be based on outcome measures; as condition of receiving funds, States must provide outcome measure data; Secretary's annual report to Congress to be based on outcome measures); id. § 673b(c)(2) (data requirements to include number of foster care adoptions; determinations based on AFCARS data). Cf. id. § 677(f) (data collection and performance measurement for foster care independent living programs based on outcomes); 65 Fed. Reg. at 4021 (Prior to and shortly after the ASFA's

31

enactment, the DHHS consulted extensively with the states (including, by inference, New Mexico) regarding the forthcoming regulations and their focus.). Furthermore, not only are the 2000 regulations in essence procedural, as the substantive portions of the ASFA are in the 1997 Act itself, but many of the 2000 regulations reiterate not only ASFA requirements but also those in the AACWA, compare, e.g., 45 C.F.R. § 1355.34(c)(1) with 42 U.S.C. § 622(b)(10)(10)(i), and AFCARS. Consequently, the "one main difference" between the ASFA and the SEP which Defendants generally point to in their motion to dismiss ("that ASFA relates to measuring outcomes . . . while the SEP gauges process[] deadlines or steps to show work completed," Defs.' Mot. Dismiss at 13; id. at 5), is a difference that Defendants must have been aware of (or should have known) when they negotiated and executed the SEP. A Rufo motion is not the proper means for a consent decree party to attempt to achieve what it wishes in hindsight it had negotiated instead. Cf. Rufo, 502 U.S. at 383 (appropriate grant of relief does not include "when it is no longer convenient to live with the terms of [an institutional reform] consent decree"). Defendants have not carried their burden under Rufo that the ASFA (and the 2000 regulations) generally constitutes an unforeseen, substantial change in circumstance warranting dismissal of the SEP.

    In addition to their general arguments, Defendants contend that the ASFA and the 2000 regulations render enforcement of Sections IV and III(D) no longer equitable. As to Section IV (Information and Records Systems), Defendants contend that "[s]eparate monitoring of a parallel [data] system is inequitable, given the change in law requiring a system meeting ASFA requirements and given ASFA's independent monitoring of the data system." Defs.' Mot. Dismiss at 15 (citing 45 C.F.R. § 1355.34(c)(1), which references and replicates 42 U.S.C.

§ 622(b)(10)(B)(i)). There is insufficient evidence, however, that the enforcement of Section IV

would be sufficiently onerous so as to be inequitable, especially in the context of modern

technological capabilities and the duplication between the 2000 regulations and prior federal

legislation, such as the ASFA and AFCARS, <u>compare</u>, <u>e.g.</u>, 45 C.F.R. pt. 1355, Apps. A, B (Oct.

1, 2001, data elements) <u>with</u> 42 U.S.C. § 679(c)(3) (data collection system) and <u>with</u> 45 C.F.R.

pt. 1355 Apps. A, B (1997 data elements). Further, Defendants have provided no reason why the

federal requirements concerning data collection and reporting could not have been expressly

incorporated into the SEP, especially given that the federal data requirements Defendants cite to

in their motion were in existence when the SEP was executed.  Therefore, as to Section IV,

Defendants have not carried their burden of showing that a significant change in circumstances

warrants revision of the SEP and dismissal of Section IV. <u>See</u> Defs.' Mot. Dismiss at 3, 4 (citing

<u>Rufo</u>, 505 U.S. at 383-84).

      Defendants second specific argument is that given the outcome approach of ASFA and the

2000 regulations, Section III(D) of the SEP (Adoption Home Studies) no longer has utility and its

enforcement is no longer equitable. As an example, Defendants point to ASFA's measurement of

the number of adoptions as contrasted with Section III(D)'s measurement of the timing of

adoptive home studies. The difference in compliance measurements between Section III(D) of the

SEP and the ASFA is not significant. Without a home study, a child cannot be adopted by a

prospective family. As Defendants point out, "CYFD must have a proficient home study process

in order to meet the outcome measures in the ASFA reviews." Defs.' Mot. Dismiss at 14. The

record does not evidence that continued enforcement of Section III(D) would be so duplicative as

to be substantially onerous and without any utility and thus no longer equitable. Further, the

federal regulatory focus on adoption outcomes existed before the SEP was executed and, thus, can not have been unforseen. See, e.g., 42 U.S.C. § 679b(1); id. § 679(c)(3)(C)(ii).[23]  Defendants, consequently, have not met their burden under Rufo as to Section III(D).

Finally, even assuming, arguendo, that the federal requirements were an unforeseen, significant change in legal circumstance, making Defendants' compliance with the SEP substantially more onerous, Defendants' requested relief, complete dismissal of the SEP, is not narrowly tailored to resolve the alleged problems created by the putative change in circumstances. A court's power to grant Rule 60(b) relief is not open-ended, but limited by Rufo's constraints. Modification of a consent decree may not eviscerate the purpose of the agreement – an agreement consented to by the moving party. See Rufo, 502 U.S. at 387.  Moreover, a court is under no obligation to approve a modification that is at the statutory floor.  Cf. id. at 391 (A "proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor.").

In conclusion, the Court is not persuaded that the ASFA and the 2000 regulations constitute a sufficient change in circumstance; that if they do, that they were not anticipated by Defendants at the time they entered the consent decree; or that if they do constitute an unforeseen significant change in circumstance, that Defendants' proposed modification, complete dismissal, is sufficiently tailored. Defendants' motion to dismiss will be denied.

_____

[23] As an example of ASFA's outcome approach, Defendants point to the 2000 regulations' measurement of state compliance with the ASFA requirement of diligent "recruitment of potential foster and adoptive families." 45 C.F.R. § 1355.34(b)(2)(ii)(C) (referencing 42 U.S.C. § 622(b)(9)). The Court fails to see the import of Defendants' citation. Clearly, federal monitoring of state recruitment of families would not cause Section III(D) compliance, or enforcement, to be inequitable. Further, § 1355.34(b)(2)(ii)(C) was part of the legal landscape when Defendants executed the SEP.

**C.      Plaintiffs' Motion to Modify and to Affirm**

Plaintiffs move the Court to affirm the sections of the SEP which do not violate <u>Younger</u>. The Court found above that the SEP sections which Defendants have not exited do not violate <u>Younger</u>, with the exception of the first portion of Section II(D).  Therefore, consistent with its findings, the Court will grant Plaintiffs' motion to affirm.

Pursuant to Rule 60(b) and <u>Rufo</u>, Plaintiffs also seek to amend the first portion of Section II(D) of the SEP. Specifically, Plaintiffs move to add the below italicized wording to Section II(D):

> Unless the children's court so orders, against the documented recommendation of the Department, *or unless a Social Work Consultant approves and documents a reason for it in the exercise of reasonable social work judgment*, a plan of Emancipation will not be established for children twelve and under. . . .

Pls.' Supp. Mem. at 9. Plaintiffs contend that the Tenth Circuit's most recent <u>Joseph A.</u> opinion "establish[d] a new standard for <u>Younger</u> abstention," a standard "that would make [the first portion of Section II(D)] unenforceable." Pls.' Supp. Mem. at 4. Defendants disagree.

Contrary to Defendants' arguments, <u>Joseph A.</u> is not merely a reiteration of established <u>Younger</u> case law.  The Tenth Circuit itself recognized "that this is not the typical <u>Younger</u> case." <u>Joseph A.</u>, 275 F.3d at 1268. Further, it is doubtful that Section II(D) of SEP would have been executed as written if the parties had understood <u>Younger</u> as recently interpreted by the Tenth Circuit. The <u>Joseph A.</u> opinion is a change in decisional law, making impermissible what is an obligation in the SEP. <u>See</u> <u>Rufo</u>, 502 U.S. at 388.  Alternatively, <u>Joseph A.</u> clarifies <u>Younger</u> case law in the Tenth Circuit, such that "the parties based their [pre-<u>Joseph A.</u>] agreement on a misunderstanding of the governing law." <u>Id.</u> at 390. Therefore, the Court concludes that <u>Joseph</u>

A. constitutes a change in circumstances supporting a modification of the first portion of Section II(D) of the SEP.

      Not only is the proposed modification of SEP Section II(D) warranted, but as required by Rufo, Plaintiffs' proposed modification is "tailored to resolve the problems created by the change in circumstances." Id. at 391.  Plaintiffs' proposed modification eliminates Section II(D)'s Younger-violating blanket prohibition against Emancipation as a permanency planning goal for children twelve years of age and younger while presenting no Younger problems in and of itself. Plaintiffs' suggested language allows for Emancipation to be established as a permanency goal for children twelve years and under if court-ordered or if the goal is approved by a Social Work Consultant (with a documented reason for it in the exercise of reasonable social work judgment). The proposed language is unlike an injunction or a declaratory judgment.  Joseph A., 275 F.3d at 1268. It is not a categorical bar against a possible planning option, does not categorically silence the Department's counsel in its advocacy before the Children's Court, or otherwise interfere with the operation of the state court. Further, contrary to Defendants' argument, the language does not require the federal court to review the decisions of the Children's Court – either expressly or insidiously.

      Defendants further contend that the proposed additional requirement "is not the agreement of the parties" because it adds "another layer of review not negotiated in the [SEP]." Defs.' Resp. at 5-6. The Court concludes otherwise. Clearly, the exact language Plaintiffs propose is not in the SEP as executed.  However, the proposed modification not only upholds the (negotiated) spirit of Section II(D) that Emancipation not be a general permanency goal for young children but also is in line with the other types of required approval agreed to by the parties in the SEP.  See, e.g.,

SEP Sect. II(A), (B) (all written assessment and training plans must be approved by a supervisor); SEP Sect. VIII(D)(1) (for a plan to be "appropriate," a social worker must judge the plan to be consistent with reasonable, competent social work practice); SEP Sect. II(E) (a social worker consultant must approve permanency plans of Long Term Foster Care). Consequently, the Court will grant Plaintiffs' proposed modification to the first part of Section II(D).

## III.    CONCLUSION

It is the Court's fervent hope that the parties will redirect their energies from litigating this case to problem-solving and addressing the permanency needs of children in the Department's care and custody.[24]  Not only do these children depend on it, but so do the lives of those who will be impacted by these children and the future of the New Mexico.

Wherefore,

IT IS HEREBY ORDERED that the Court finds, as detailed above, the Department has **exited** Sections V and VI of the 1998 Stipulated Exit Plan; the first portion of Section II(D) of the 1998 Stipulated Exit Plan, as written, is **unenforceable** under Younger; and all remaining sections of the 1998 Stipulated Exit Plan are **enforceable** under Younger.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Modify Stipulated Exit Plan to Comport with the Tenth Circuit's January 7, 2002[,] Opinion and to Affirm Remaining Sections of the SEP, filed February 25, 2002, [Doc. No.1596], is **granted** as detailed above.

IT IS FURTHER ORDERED that Section II(D) of the 1998 Stipulated Exit Plan is

---

[24] The parties may wish to review Idaho's comprehensive permanency model, the Idaho Child Protection Manual, produced as a project of the Idaho Supreme Court Committee to Reduce Delays for Children in Foster Care (May 2002) (with links to updates), http://www.abanet.org/child/cipcatalog/pdf/id_02_01.pdf, or the permanency materials available from the American Humane Association, http://www.americanhumane.org.

**modified** to read, in italicized part, as follows:

> Unless the children's court so orders, against the documented recommendation of the Department, *or unless a Social Work Consultant approves and documents a reason for it in the exercise of reasonable social work judgment*, a plan of Emancipation will not be established for children twelve and under. For children of the ages twelve, thirteen and fourteen, counseling (which may be provided by a licensed social worker) for a child must be provided before establishing the plan.

IT IS FURTHER ORDERED that Defendants' Motion to Dismiss Provisions of Stipulated Exit Plan Not [sic] Enforceable Under Younger Pursuant to Rufo and Rule 60(b)(5) and Memorandum in Support Thereof, filed March 25, 2002, [Doc. No. 1600], is **construed** as a motion for modification or for relief from judgment, pursuant to Rule 60(b) and Rufo v. Inmates of Suffolk County Jail, 502 U.S. 388 (1992), and is **denied**.

**DATED** this 16th day of January, 2003.

_____

**SENIOR UNITED STATES DISTRICT JUDGE**

Counsel for Plaintiffs:    Susan Lambiase
                           Marcia Robinson Lowry
                           Children's Rights, Inc.
                           New York, New York

                           Robert D. Levy
                           Geer, Wissel & Levy. P.A.
                           Albuquerque, New Mexico

Counsel for Defendants:    Timothy V. Flynn-O'Brien
                           Bryan & Flynn-O'Brien
                           Albuquerque, New Mexico

                           Diane Garrity
                           General Counsel, Children, Youth & Families Department
                           Santa Fe, New Mexico

John H. Clough
Attorney General's Office
Albuquerque, New Mexico